BEFORE THE ALASKA DEPARTMENT
OF EDUCATION AND EARLY DEVELOPMENT
SPECIAL EDUCATION DUE PROCESS HEARING OFFICER

| | |
|---|---|
| IN THE SPECIAL EDUCATION MATTER ) | Due Process Hearing #06-14 |
| ) | |
| CONCERNING STUDENT ) | JUL 1 0 2006 |

## FINAL DECISION AND ORDER

### I. Introduction and Procedural Background

A due process hearing was held in this matter on April 24, 25 and 26, and May 4, 2006. Attending the hearing were Student's mother ("Parent"), her counsel Meg Allison of Disability Law Center ("DLC"), Brad Owens, counsel for Anchorage School District ("ASD"), and ASD's representative Eudora Fraczek. The hearing was recorded by a court reporter and subsequently transcribed.

Witnesses testifying at the hearing were Bobby Jefts, assistant principal at Romig Middle School; Leslie Vandergaw, ASD's executive director for middle schools; Jerry Sjolander, ASD's executive director for special education; Bob Ellers, a special education department chair and IEP compliance facilitator; Linda Richardson, ASD's coordinator for special education; Bobby Jones, guidance counselor at Romig; John Freeman, ASD's teacher at its Outreach Program; Dr. Phillip Mattheis, a physician with Denali Family Services; Dr. Kristi Fuller, a

LAW OFFICES OF
ANDREW M. LEBO
425 G Street, Suite 920
ANCHORAGE, AK 99501
(907) 276-6275
FACSIMILE
(907) 278-4848

Final Decision and Order       No. 06-14                                    -1-
[/LEBO 070606 Decision.doc]

Exhibit 1
Page 1 of 31

clinical neuropsychologist; Christine Masneri, a prevention/intervention counselor at Romig; and Parent.

This matter was initiated by a request for hearing submitted by Parent on January 25, 2006. The request for hearing generally indicated that Student had previously been in special education, he had been "exited" from special education services but continued to have problems at school, he had recently experienced several head injuries, and that he was now facing expulsion based on a discipline problem at Romig Middle School.

On January 26, 2006 DLC entered its appearance on behalf of Parent and submitted a letter expanding on the issues raised in Parent's request for hearing. DLC represented Parent throughout this matter. I was appointed as hearing officer on January 31, 2006. ASD submitted its written response to the request for hearing on February 6, 2006; in its response, ASD stated the following request: "if the student has been evaluated or provided medical, psychological or counseling services that are relevant to the student's disability or claims in this matter, we request that the parents provide a signed consent to allow us to obtain copies of any <u>relevant medical records</u>." (ASD's Due Process Hearing Request Response, Feb. 6, 2006, at 4; emphasis in original.) ASD's counsel subsequently sent an email to DLC reminding them of this request.

The 45-day timeframe for issuance of a decision, per 4 AAC 52.550(f),

LAW OFFICES OF
ANDREW M. LEBO
425 G Street, Suite 920
ANCHORAGE, AK 99501
(907) 276-5275
FACSIMILE
(907) 276-4648

Final Decision and Order        No. 06-14
[/LEBO 070606 Decision.doc]

-2-

Exhibit 1
Page 2 of 31

originally fell on March 9, 2006.  On February 7, a pre-hearing conference was held and hearing dates were selected for March 8 and 9, 2006.  On February 10, 2006, a resolution meeting was convened, but the parties were unable to resolve of any of the issues in dispute.[1]  On March 7, DLC submitted what amounted to a joint motion for continuance of the hearing dates, explaining that Dr. Fuller's expected neuropsych report was not yet completed and available for review; ASD also explained that an eligibility meeting for Student had not been completed and would need to reconvene on March 15.  As a result, the hearing was rescheduled for April 6 and 7, 2006, and I found good cause for the extension of the hearing timeframe.

On March 31 a status conference was held; an IEP was being developed for Student but had not yet been completed, so the parties stipulated to an additional continuance and extension of the hearing timeframe.  At a subsequent status conference on April 4, new hearing dates were set for April 24, 25 and 26, 2006.  I later found that the parties' stipulation, along with the need to allow for the IEP to be completed and for the parties to explore the possibility of settlement, constituted good cause for the extension.

On February 15, 2006, DLC submitted a "motion for interim services,"

---

[1] The convening of the resolution meeting potentially extended the 45-day timeframe by 30 days, under the federal standard set by IDEA 2004; the issue of whether the federal standard supercedes or preempts the state standard of 4 AAC 52.550(f) was not raised by the parties, however, and in any event is a moot issue, as the parties stipulated that good cause existed for the extensions of the 45-day timeframe that have occurred in this matter.

LAW OFFICES OF
ANDREW M. LEBO
425 G Street, Suite 920
ANCHORAGE, AK 99501
(907) 276-8275
FACSIMILE
(907) 278-4948

Final Decision and Order    No. 06-14                                    -3-
[/LEBO 070606 Decision.doc]

Exhibit 1
Page 3 of 31

arguing that ASD had a basis of knowledge that Student is a student with a disability when it imposed discipline on him in December 2005, and therefore it should be required to provide interim special education services to Student during the pendency of this proceeding. I issued an order denying the motion on March 2, 2006. DLC moved for reconsideration of my March 2 order on March 10, 2006. The parties subsequently stipulated to holding the motion for reconsideration in abeyance while they explored possible settlement. After the settlement efforts were unsuccessful, ASD submitted its response to the motion for reconsideration on April 4; I issued an order denying the motion on April 6.[2]

During Dr. Mattheis' testimony at the hearing, it was determined that ASD's counsel had not received all of the potentially available medical anc counseling records contained in the files on Student at Denali Family Services.[3] Based on not having had the opportunity to review all of the available records from the Denali Family Services' files, ASD's counsel objected to Dr. Mattheis' testimony and moved that it be stricken. ASD later modified this request, asking that rather than striking Dr. Mattheis' testimony I should accord it little weight in my deliberations.

I now issue the following findings of fact and conclusions of law,

---

[2] All of my pre-hearing orders will be made a part of the record of this matter.
[3] Ms. Allison stated at the hearing that DLC had requested all the relevant records from Denali Family Services and had passed along to ASD's counsel the files received; but apparently DLC had not followed up with Denali Family Services or Dr. Mattheis to confirm that all available records had been produced to DLC.

LAW OFFICES OF
ANDREW M. LEBO
425 G Street, Suite 920
ANCHORAGE, AK 99501
(907) 276-6275
FACSIMILE
(907) 276-6848

Final Decision and Order   No. 06-14                              -4-
[/LEBO 070606 Decision.doc]

Exhibit 1
Page 4 of 31

constituting the Final Decision and Order in this matter.

## II. Findings of Fact

1.    Student is 14 years old (date of birth 11-28-1991).  He attended 7th grade at Romig Middle School during the 2004-2005 school year, and part of 8th grade at Romig in the 2005-2006 school year.

2.    Student M.H. was previously identified by ASD as eligible for special education services as having a speech impairment and a learning disability.  He was "exited" from special education in November 2003, when he was in sixth grade.

3.    In November 2003, Parent signed off in agreement with ASD's finding that Student was no longer eligible for special education services.

4.    Parent testified that at the time Student was exited from special education, she was not aware that Student could be found eligible for special education for a disability other than a learning disability, nor was she aware that Student could be eligible for a section 504 plan even if he was not eligible for special education.

5.    Parent was given ASD's then-current Notice of Procedural Safeguards prior to the meeting of the eligibility determination team that resulted in Student being exited from special education services in November 2003.

LAW OFFICES OF
ANDREW M. LEBO
425 G Street, Suite 620
ANCHORAGE, AK 99501
(907) 276-8275
FACSIMILE
(907) 276-4848

Final Decision and Order      No. 06-14                                    -5-
[/LEBO 070606 Decision.doc]

Exhibit 1
Page 5 of 31

6.    The Notice of Procedural Safeguards contains a short discussion entitled "Children With Disabilities Under Section 504" which states as follows:

"Some children may have a disability that affects a major life activity but does not fit into one of the categories of disability under the Individuals with Disabilities Act (IDEA 97). These children may be protected by a different federal law: Section 504 of the Rehabilitation Act of 1973. . . . For more information about Section 504, contact your school district's Section 504 coordinator."

7.    Parent did not dispute Student's November 2003 exit from special education services nor did she file a request for due process hearing regarding the exiting.

8.    Parent testified that she was told at the time of Student's November 2003 exit from special education that ASD would provide accommodations to Student to help him with his education. Parent further testified that, to the best of her knowledge, no such accommodations were provided by ASD.

9.    The Prior Written Notice for Student's November 2003 exit from special education states that ASD will "provide continuing support and accommodations in the regular education classroom as needed." Exhibit D.

10.    Student began attending 7th grade at Romig Middle School in fall 2004. He received mostly Bs and Cs in his 7th grade classes.

11.    Towards the end of 7th grade, Student received two out-of-school suspensions: a one-day suspension for willful disobedience in April 2005, and a three-day suspension for willful disobedience in May 2005.

LAW OFFICES OF
ANDREW M. LEBO
425 G Street, Suite 920
ANCHORAGE, AK 99501
(907) 276-8275
FACSIMILE
(907) 278-4848

Final Decision and Order        No. 06-14                                    -6-
[/LEBO 070606 Decision.doc]

Exhibit 1
Page 6 of 31

12.   On May 18, 2005, Ms. Masneri referred Student to DFYS for suspected child abuse, based on information she had received from Student.   The referral involved apparent criminal conduct and home-related behavior by Student that occurred outside of school.

13.   While Student was suspended in May 2005, Parent advised Ms. Masneri that Student was receiving counseling/therapy at Langdon Clinic.

14.   Parent filled out and submitted to ASD a Health History form for Student in August 2005; on the form, Parent checked "No" for the following health-related items: "behavior concerns," "ADHD," and "episode of loss of consciousness."

15.   ASD's health records for Student show no loss of consciousness or head injuries occurring at school.

16.   Student was evaluated by a clinical psychologist at Langdon Clinic, Dr. Delbert, whose report also included discussion of an evaluation conducted by Dr. Berenson, a psychiatrist at Langdon.   Dr. Berenson diagnosed Conduct Disorder; Dr. Delbert ruled out Conduct Disorder and diagnosed Disruptive Behavior Disorder; both doctors diagnosed Cannabis Abuse.

17.   No one at ASD saw or received a copy of Dr. Delbert's report until after Parent had submitted her request for due process hearing, in January 2006.

18.   Student attended the 1st quarter of 8th grade at Romig in fall 2005; he

LAW OFFICES OF
ANDREW M. LEBO
425 G Street, Suite 920
ANCHORAGE, AK 99501
(907) 276-9275
FACSIMILE
(907) 276-4848

Final Decision and Order      No. 06-14                                    -7-
[/LEBO 070606 Decision.doc]

Exhibit 1
Page 7 of 31

received Bs and Cs, with a D in Language Arts and an F in Math.

19.    Student began engaging in problematic conduct at school in November 2005, resulting in several out-of-school suspensions totaling 11 days.

20.    On November 4, 2005, Ms. Masneri wrote to Romig Assistant Principal Jefts responding to an email regarding Student's suspension, informing Mr. Jefts of Student's criminal conduct the prior spring and stating that "[s]trong consequences would be good for him because this is a pattern for him." Exhibit M at 1.

21.    Mr. Jefts testified that Student's 11 days of suspension in November 2005 interfered with his ability to get an education.

22.    On December 16, 2005, Student was suspended for 9 days with a recommendation for expulsion, based on conduct involving profanity, obscene language, and threats made to a Romig teacher.

23.    At the time of the December 16 suspension, ASD had no information regarding any physical injuries or psychological impairments that might form the basis for referring Student for special education; ASD had not received a copy of Dr. Delbert's report at that time.

24.    After the December 16 suspension, on January 25, 2006, Parent requested that Student be evaluated for special education eligibility.

25.    In February 2006, ASD offered services at its Outreach program to

LAW OFFICES OF
ANDREW M. LEBO
425 G Street, Suite 920
ANCHORAGE, AK 99501
(907) 276-8275
FACSIMILE
(907) 276-4848

Final Decision and Order    No. 06-14
[/LEBO 070606 Decision.doc]

-8-

Exhibit 1
Page 8 of 31

Student. Student and Parent visited the Outreach facility on February 17, met with the Outreach teacher Mr. Freeman, and filled out paperwork to enroll Student in the program. But Parent subsequently contacted Mr. Freeman and indicated that Student would not be attending the program; Student subsequently stayed at home with Parent and received no educational services until April 24, 2006.

26. On February 15, 2006, Parent signed a Consent for Evaluation to allow ASD to conduct assessments of Student; the consent form was apparently not sent to ASD until February 16.

27. Student was evaluated by an ASD school psychologist shortly thereafter and the psychologist issued his evaluation report on March 6, 2006.

28. An eligibility team meeting was held on March 7 and 15, 2006; Parent attended the meeting with an advocate from DLC. Parent provided the team with copies of Dr. Delbert's report, as well as an evaluation report by Dr. Mattheis (a pediatric physician who is part of the team now treating Student at Denali Family Services), and the above-mentioned report from neuropsychologist Dr. Fuller.

29. Student was found eligible for special education services under the category of Other Health Impaired ("OHI") on March 15, 2006.

30. All members of Student's IEP team agreed with the OHI eligibility determination, including Parent.

31. On April 3, 2006, a meeting of Student's IEP team took place and

LAW OFFICES OF
ANDREW M. LEBO
425 G Street, Suite 920
ANCHORAGE, AK 99501
(907) 276-6273
FACSIMILE
(907) 278-4948

Final Decision and Order    No. 06-14                    -9-
[/LEBO 070606 Decision.doc]

Exhibit 1
Page 9 of 31

Student's IEP was developed and completed.  The IEP sets out special education services to be provided to Student, and the school setting in which the services are to be delivered, but it does not specify the school location where Student would attend school.

32.  At the April 3 IEP meeting, the team discussed the possibility of Student returning to Romig on April 11.

33.  Parent wrote a letter dated April 5 to the Romig special education chair asking why Student apparently could not return to Romig on April 11.

34.  Ms. Vandergaw responded on behalf of ASD with a letter dated April 5, explaining that a manifestation determination meeting would need to be held, due to the nature of Student's behavior in December that had resulted in his suspension.   Mr. Sjolander wrote a letter dated April 10 affirming Ms. Vandergaw's letter.

35.  On April 12, 2006, a manifestation meeting was held to "determine whether or not the alleged behavior of use of profanity and making threatening statements to a teacher is a manifestation of [Student's] disability."  The team made a "no causality" finding, concluding that Student's behavior in December had **not** been a manifestation of his disability.

36.  Dr. Mattheis attended a portion of the manifestation determination meeting and imparted information to the team regarding his diagnosis that Student

LAW OFFICES OF
ANDREW M. LEBO
425 G Street, Suite 920
ANCHORAGE, AK 99501
(907) 276-8275
FACSIMILE
(907) 278-4648

Final Decision and Order     No. 06-14                                        -10-
[/LEBO 070606 Decision.doc]

Exhibit 1
Page 10 of 31

suffers from traumatic brain injury ("TBI"), resulting from premature birth and three fairly recent sports-related head injuries, suffered over approximately the prior year.

37. Dr. Mattheis testified that in his opinion, Student's December 2005 behavior that led to his suspension and possible expulsion was a manifestation of his disability; he testified that Student's behavior is consistent with a diagnosis of TBI, and that TBI was part and parcel of Student's OHI special education classification.

38. During Dr. Mattheis' testimony, it was disclosed that ASD's counsel had not had access to all of the potentially available medical records and counseling records contained in the files on Student at Dr. Mattheis' clinic, Denali Family Services.

39. The prior written notice for the manifestation determination of "no causality" presents the team's conclusion as a "consensus." Testimony made clear, however, that some team members were uncertain as to the "no causality" conclusion reached by the team, and that Parent disagreed with it.

40. Parent testified that Student never received any medical treatment for any of the three head injuries he suffered over the year prior to the hearing.

41. The only medical evidence presented at the hearing concerning Student's TBI was the reports and testimony of Drs. Mattheis and Fuller. Both

LAW OFFICES OF
ANDREW M. LEBO
425 G Street, Suite 920
ANCHORAGE, AK 99501
(907) 276-8275
FACSIMILE
(907) 278-4848

Final Decision and Order    No. 06-14    -11-
[/LEBO 070606 Decision.doc]

Exhibit 1
Page 11 of 31

doctors apparently developed their diagnoses based on anecdotal evidence received from Student and Parent.

42.  On April 14, Ms. Vandergaw sent Parent a letter stating that despite the negative or "no causality" manifestation determination, ASD would not be pursuing Student's expulsion, and that he would be allowed to return to school on April 17. Ms. Vandergaw further stated, however, that Student was being administratively assigned to Mears Middle School in order to give him a "fresh start."

43.  Student began attending Mears Middle School on April 24, 2006 (the record was unclear as to why Student was unable to attend Mears between April 17 and April 24).

44.  At the close of the hearing the parties stipulated that their post-hearing briefs should address the following eight issues:

(1) Is the decision regarding the location at which a student received services equivalent to a placement decision that can only be made by the IEP team, or is location a decision that can be administratively by ASD?

(2) What was the practical effect, if any, of the "no causality" manifestation determination?

(3) What weight should be given to Dr. Mattheis' testimony, in light of ASD's objection regarding lack of access to the medical records from Denali Family Services?

(4) Do I have jurisdiction over Student's sec. 504 claim?

LAW OFFICES OF
ANDREW M. LEBO
425 G Street, Suite 920
ANCHORAGE, AK 99501
(907) 276-6275
FACSIMILE
(907) 276-4848

Final Decision and Order       No. 06-14                                    -12-
[/LEBO 070606 Decision.doc]

Exhibit 1
Page 12 of 31

(5) What is the statute of limitations applicable to Student's 504 claim?

(6) Can I award money damages on Student's 504 claim?

(7) Did ASD have a "basis of knowledge" as to Student's disability, and if so, when should he have been referred for special education evaluation?

(8) Is Student entitled to compensatory education services, and if so, how much?

## III. Conclusions of Law

### 1. Burden of Proof

The issue of who bears the burden of proof on IDEA issues in this matter is not a straightforward question. I previously ruled in my order denying Student's motion for interim services that the allocation of the burden of proof in the state's education regulations was not affected by the recent U.S. U.S. Supreme Court decision in Schaffer v. Weast, 546 U.S. ___, 126 S.Ct. 528, 163 L. Ed. 387 (2005), and therefore that the burden of proof was on ASD per 4 AAC 52.550(e)(9). After Parent requested this hearing, however, the Alaska Board of Education on March 1, 2006 adopted a change to 4 AAC 52.550(e)(9) which places the burden of proof on the party who requests the hearing. This change went into effect on May 20, 2006.

DLC argues that it would be unfair to shift the burden of proof to Parent in mid-proceeding, after the hearing has been held and the record closed; DLC cites a

LAW OFFICES OF
ANDREW M. LEBO
425 G Street, Suite 920
ANCHORAGE, AK 99501
(907) 276-8275
FACSIMILE
(907) 278-4648

Final Decision and Order     No. 06-14                                    -13-
[/LEBO 070606 Decision.doc]

Exhibit 1
Page 13 of 31

recent Alaska due process hearing decision in *A.M. v. F.N.B.S.D.*, no. 06-07, where IHO Cerro found that such a shift to the parents in mid-proceeding would be fundamentally unfair. The parties raised this issue with me at the beginning of the hearing, however, and I cautioned that although I was not issuing a ruling on the question at that time, because the issue was "in transition" DLC "should assume the worst and assume that you have to . . . meet some level of a burden of production."

Any potential unfairness to Parent resulting from a shift of the burden of proof was mitigated by the advance notice to Parent and her counsel that they should be prepared for such a shift and should accordingly plan the presentation of their case based on the assumption that the burden would be place on Parent. Therefore, based on the change to 4 AAC 52.550(e)(9), the burden of proof is on Parent in this matter. [4]

### 2. **Statute of Limitations**

The limitations period for seeking relief through a due process hearing for IDEA violations is one year "after the date that the school district provides the parent with written notice of the decision with which the parent disagrees." AS 14.30.193(a).

### 3. **"Location" vs. "Placement"**

ASD presented several case citations in support of its argument that the

---

[4] DLC submitted no authority to counter ASD's contention that Parent has the burden of proof regarding sec. 504 issues.

LAW OFFICES OF
ANDREW M. LEBO
425 G Street, Suite 920
ANCHORAGE, AK 99501
(907) 276-8275
FACSIMILE
(907) 276-4646

Final Decision and Order    No. 06-14                                -14-
[/LEBO 070606 Decision.doc]

Exhibit 1
Page 14 of 31

decision regarding the location at which a student shall receive services under an IEP is an administrative decision that can be rendered by ASD administrators rather than the IEP team.   Essentially these cases hold that "location" and "placement" are two entirely distinct concepts.  DLC did not refute this argument in its post-hearing briefs, instead merely referring in a conclusory fashion to the assignment of Student to Mears as a "placement" decision, without addressing the distinction between placement and location.  Therefore I conclude that the change of location of services from Romig to Mears was within ASD's authority to decide as an administrative matter.

DLC also argued that the assignment of Student to Mears was a result of the "no causality" manifestation determination, and therefore the decision should have been made by Student's IEP team.   Given that a change of location can be assigned as an administrative matter, it's clear that regardless of the outcome of the manifestation determination, the assignment of Student to Mears could have been done outside the purview of Student's IEP team.  In addition, the testimony and other evidence indicated that ASD's assignment of Student to Mears was not done for a punitive purpose but was done to give Student a fresh start with a new set of peers in a new environment.  Given Parent's own comments to ASD staff that it might not be appropriate for Student to return to Romig, I find this explanation reasonable and credible.

LAW OFFICES OF
ANDREW M. LEBO
425 G Street, Suite 920
ANCHORAGE, AK 99501
(907) 279-8275
FACSIMILE
(907) 278-4848

Final Decision and Order        No. 06-14                                              -15-
[/LEBO 070606 Decision.doc]

Exhibit 1
Page 15 of 31

The issue of the propriety of a "change of location" decision might be resolved differently under different circumstances, such as where a showing is made that a student would be denied FAPE as a result of the move. However, no showing was made in this matter that the assignment of Student to Mears would result in a denial of FAPE.

### 4. The Impact of the Manifestation Determination

The normal outcome of a "no causality" finding of a manifestation determination team, under normal circumstances, is that the district then can impose further disciplinary sanctions on the student. In this case, however, ASD elected not to pursue any further disciplinary action against Student after the manifestation team's "no causality" determination. Therefore I conclude that the manifestation determination had no negative impact on Student's education, notwithstanding DLC's arguments to the contrary, discussed above.[5]

### 5. Dr. Mattheis' Testimony

ASD objected to Dr. Mattheis' testimony, based on its counsel's lack of access to some of Student's medical and counseling records from Denali Family Services. DLC argued in response that since Parent only sought testimony from Dr. Mattheis concerning his report, DLC had met its disclosure obligations by providing the report to ASD.

Despite the parties' agreement that there are no discovery procedures for due

---

[5] As discussed in Conclusion no. 3, the record does not support DLC's argument that the assignment of Student to Mears was the result of the "no causality" manifestation determination.

LAW OFFICES OF
ANDREW M. LEBO
425 G Street, Suite 920
ANCHORAGE, AK 99501
(907) 276-8275
FACSIMILE
(907) 276-4846

Final Decision and Order     No. 06-14                                    -16-
[/LEBO 070606 Decision.doc]

Exhibit 1
Page 16 of 31

process hearings under the IDEA, I always strive for full and complete disclosure of relevant records **by both sides** in due process hearings. If a party wishes to present testimony from a medical professional regarding an important issue in a hearing over which I am presiding, that party's counsel must go out of his or her way to ensure that any relevant records are disclosed to the other side, including obtaining whatever information releases are necessary to facilitate obtaining the records. Under that scenario, it would not behoove a party to take a narrow view of the universe of documents that might be relevant to the witness's expected testimony; on the contrary, counsel should aim for the broadest disclosure possible and then address any problems regarding relevance in a collaborative fashion with opposing counsel.

Based on ASD's objection, I have given Dr. Mattheis' testimony slightly less weight than I might otherwise have given it if ASD had received full disclosure of the DFS records.

### 6.    The No-Causality Manifestation Determination

DLC and Parent argue that the manifestation determination was flawed, because the manifestation determination ("MD") team failed to consider Student's apparent TBI and therefore the MD team should have found causation. They argue that if the MD team had taken into account Dr. Mattheis' diagnosis and properly addressed Student's TBI, it would have found a causal link between

LAW OFFICES OF
ANDREW M. LEBO
425 G Street, Suite 920
ANCHORAGE, AK 99501
(907) 278-8275
FACSIMILE
(907) 278-4648

Final Decision and Order        No. 06-14                                    -17-
[/LEBO 070606 Decision.doc]

Exhibit 1
Page 17 of 31

Student's disability and his problematic behavior that led to his December 2005 suspension and proposed expulsion; this in turn would have meant that Student's "placement" would have been decided by his IEP team, with Parent's participation.

The logical fault in this argument lies in the failure to address the distinction between "placement" and "location," discussed above. Therefore I need not reach the question of the propriety of the manifestation determination. But even if we set that issue aside, under the circumstances of this case I would not substitute my judgment for that of the MD team. There were simply too many question marks surrounding the TBI diagnosis and the roles that TBI and other factors may have played in Student's behavior. Although I found Parent's testimony credible and believe that she has been doing the best job that she can as Student's parent, the following issues would prevent me from reversing the manifestation determination

(a) Despite Parent's recounting of three separate serious head injuries suffered by Student in the year prior to the hearing, she had never sought any medical attention for Student in response to these incidents (other than dental care for two teeth damaged in one of the incidents);

(b) As a result, no medical records exist concerning these injuries, other than the reports of Drs. Mattheis and Fuller, which were based on anecdotal evidence from Student and Parent;

(c) Parent never disclosed the three head injuries to ASD prior to requesting the hearing, and she gave negative responses to relevant inquiries on ASD health information forms prior to the current school year;

LAW OFFICES OF
ANDREW M. LEBO
425 G Street, Suite 920
ANCHORAGE, AK 99501
(907) 276-8275
FACSIMILE
(907) 276-4848

Final Decision and Order    No. 06-14                                              -18-
[/LEBO 070606 Decision.doc]

Exhibit 1
Page 18 of 31

(d) The issues of Student's cannabis abuse and its potential impact on his behavior giving rise to the suspension were not resolved by the testimony of Dr. Mattheis and Parent; in this context I note that Dr. Delbert's report explicitly diagnosed cannabis abuse as part of Student's problematic outlook in the fall of 2005, during the period when Student's behavior was deteriorating; and

(e) The problems discussed above regarding disclosure of records from Denali Family Services: if a party expects to ask me as a hearing officer to reverse an MD Team finding based solely on an opinion of a medical practicioner, that party would do well to bend over backwards to ensure that the district has every possibly relevant record at its disposal.

All of these factors, along with a recognition that the educators who have observed a student on a day-to-day basis would nearly always be in a better position than I to judge causality issues, would lead me to uphold the manifestation determination (if there were a need for me to reach this issue).

### 7. Section 504 Jurisdiction

The parties appear to be in agreement that I can exercise jurisdiction over Student's section 504 claim.

### 8. Section 504 Statute of Limitations

ASD argues that the statute of limitations applicable to 504 claims should be the same as the one-year Alaska limitations period applicable to due process hearings. DLC argues that the applicable limitations period should be the two-year period allowed for personal injury actions under Alaska law, and DLC cites several cases with analogous holdings from the Second, Fifth, Sixth and Tenth

LAW OFFICES OF
ANDREW M. LEBO
425 G Street, Suite 920
ANCHORAGE, AK 99501
(907) 276-8275
FACSIMILE
(907) 278-4846

Exhibit 1
Page 19 of 31

Circuits. DLC's argument is more compelling and is supported by case citations; therefore I conclude that the limitations period applicable to Student's section 504 claim is two years. Any act or omission of ASD arising within the two years prior to Parent's January 25, 2006 filing of her request for hearing in this matter could give rise to a claim for violation of section 504.[6]

### 9.    Section 504 Liability

DLC has not met its burden, however, of establishing a violation of section 504. The evidence presented on this point may be summarized as follows: ASD knew that Student had a disability because he had previously been eligible for special education; when ASD exited Student from special education in November 2003, it agreed to provide accommodations to Student "if needed;" ASD allegedly failed to provide any accommodations and Student's education suffered as a result.

There can be no dispute that as of January 25, 2004, ASD as an institution was on notice that Student had previously had a disability; one can assume that ASD was chargeable with being on notice at that time that Student's disability might impact his ability to receive educational benefits in the future. But the evidence presented at hearing was that Student did fairly well in school until fall of 2005, getting "average grades" in sixth grade after exiting from special

---

[6] DLC also argues that Alaska's discovery rule should extend the limitations period because Parent testified that she didn't know about Student's section 504 rights until after filing her request for hearing. This argument fails, however, because there is no dispute that Parent received ASD's Notice of Procedural Safeguards, which generally discusses 504 rights and remedies and directs parents to the district's 504 coordinator for more information.

LAW OFFICES OF
ANDREW M. LEBO
425 G Street, Suite 920
ANCHORAGE, AK 99501
(907) 276-8275
FACSIMILE
(907) 278-4848

Final Decision and Order        No. 06-14                                    -20-
[/LEBO 070606 Decision.doc]

Exhibit 1
Page 20 of 31

education, and doing "pretty well" in seventh grade.   HR 518-520.[7]   Parent

testified that other than the two suspensions at the end of the year, Student was

"successful" in the 7th grade.  HR 523.  In addition, Parent testified that ASD did

provide accommodations to Student that helped him succeed in his seventh grade

math class.  HR 521-522.

  As for the deterioration of Student's education starting in fall 2005, the

record supports the conclusion that it was caused by Student's behavioral

problems and the resultant suspensions, which had no apparent link to Student's

disability as it was known to ASD at the time.  Student was suspended for 11 days

in November 2005, and DLC argues that this interfered with Student's ability to

receive an education, citing the testimony of Assistant Principal Jefts.  It goes

without saying, however, that being absent from school for up to half of the school

days in a month would interfere with **any** student's education.  The missing link in

the evidence here is the connection between the 11 days of suspension and

Student's disabilities.  DLC and Parent did not meet their burden of proving that

connection -- my discussion in conclusion no. 7 regarding the MD team's "no-

causality" finding is directly relevant here to this conclusion.

  Although the parties have presented me with very little guidance regarding

the elements of a 504 claim, it appears that a 504 claim is akin to a discrimination

claim, and that one can infer discrimination (i) from the district's knowledge of the

---

[7] Record references are denoted as "HR" or "Hearing Record."

LAW OFFICES OF
ANDREW M. LEBO
425 G Street, Suite 920
ANCHORAGE, AK 99501
(907) 276-8275
FACSIMILE
(907) 278-4848

Final Decision and Order          No. 06-14                                      -21-
[/LEBO 070606 Decision.doc]

Exhibit 1
Page 21 of 31

disability, (ii) its failure to accommodate the disability, and (iii) a resultant detrimental impact on the student's education. The record in this matter simply does not support the conclusion that any detrimental impact of the fall 2005 suspensions was caused by a failure by ASD to accommodate Student's disabilities, resulting in a violation of sec. 504. DLC's showing on these elements is summarized by the following unsupported statement in its post-hearing reply brief: "Because [Student] can establish discrimination under section 504, [Student] is entitled to compensation." DLC's Post-Hearing Reply Brief at 16. The statement is set forth in a conclusory fashion, but the discrimination simply is not shown. As there was no showing of any detrimental impact resulting from a failure to accommodate, there is no violation of section 504.[8]

**10.  504 Money Damages**

Because I find no violation of section 504, I further find that Student is not entitled to money damages for his 504 claim.

**11.  Basis of Knowledge**

ASD is obligated to perform "Child Find" duties pursuant to the IDEA, 20 U.S.C. 1412(a)(3), and pursuant to state law, AS 14.30.274, requiring the district to identify, locate and evaluate children suspected of having disabilities and

---

[8] DLC also cites testimony regarding an offer made by ASD at the February resolution meeting as evidence that ASD had knowledge of Student's disability and therefore had an obligation to offer a 504 plan to Parent. DLC's Post-Hearing Reply Brief at 18-19. This argument is not only entirely without merit, it is improper; counsel is hereby put on notice that citing a settlement offer as evidence regarding matters at issue in a hearing is an extremely questionable practice that could give rise to sanctions.

LAW OFFICES OF
ANDREW M. LEBO
425 G Street, Suite 920
ANCHORAGE, AK 99501
(907) 276-8275
FACSIMILE
(907) 278-4848

Final Decision and Order    No. 06-14                                    -22-
[/LEBO 070606 Decision.doc]

Exhibit 1
Page 22 of 31

determine whether they are eligible for special education services. The question is whether ASD had a "basis of knowledge" that should have triggered its Child Find duties.

The parties first addressed the basis of knowledge issue prior to the hearing, in the context of DLC's motion for interim services. [9] I denied the motion for interim services, based on the standard set forth in IDEA 2004. I later denied DLC's subsequent motion for reconsideration, ruling that I could not rule in Student's favor based on factual assertions in DLC's brief that were not supported by evidence in the record. Now that a record has been developed, the basis of knowledge issue is properly before me.

The standard applicable to this question was argued by the parties in their briefs on the interim services motion. DLC argued then and has reiterated in its post-hearing briefs that I should apply the standard set forth in IDEA 1997 to the facts that occurred in this matter before July 1, 2005, the date on which IDEA 2004 went into effect. The relevant portions of IDEA 1997 and IDEA 2004 are set forth below:

> IDEA 1997:
> "A school district is deemed to have had knowledge of the child's disability and its need for special education if one of four

---

[9] DLC argues that ASD's post-hearing brief merely incorporated by reference its arguments from the interim services briefs and failed to "synthesize" its arguments with the evidence presented at the hearing, and therefore I should find a waiver by ASD of its right to contest this issue. This argument is without merit, as even though ASD was not obligated to present such a synthesis, ASD did so in its post-hearing reply brief, and in any event the facts developed on the record speak for themselves.

LAW OFFICES OF
ANDREW M. LEBO
425 G Street, Suite 920
ANCHORAGE, AK 99501
(907) 276-6275
FACSIMILE
(907) 276-4648

Final Decision and Order    No. 06-14    -23-
[/LEBO 070606 Decision.doc]

Exhibit 1
Page 23 of 31

circumstances exist: . . . (ii) the behavior or performance of the child demonstrates a need for such services." 20 U.S.C. 1415(k)(8)(1997).

IDEA 2004:
The district "shall be deemed to have knowledge that a child is a child with a disability if, before the behavior that precipitated the disciplinary action occurred - -
(i) the parent of the child has expressed concern in writing to supervisory or administrative personnel of the appropriate educational agency, or a teacher of the child, that the child is in need of special education and related services;
(ii) the parent of the child has requested an evaluation of the child...; or
(iii) the teacher of the child, or other personnel of the local educational agency, has expressed specific concerns about a pattern of behavior demonstrated by the child, directly to the director of special education of such agency or to other supervisory personnel of the agency." 20 U.S.C. sec. 1415(k)(5)(B).

In my denial of the motion for reconsideration, I noted that this IDEA 2004 basis of knowledge standard was first set forth in the regulation implementing IDEA 1997, 34 CFR 300.527, which has been in effect since 1999 and remains unchanged to date.

The evidence proffered by DLC on this issue is similar to that discussed above in the context of Student's section 504 claim. ASD counters that much of the evidence concerning Student's behavioral problems in the spring related to issues arising outside of school, and that the events in the fall of 2005 leading up to Student's December 2005 suspension do not meet the "basis of knowledge" requirements of the IDEA.

LAW OFFICES OF
ANDREW M. LEBO
425 G Street, Suite 920
ANCHORAGE, AK 99501
(907) 276-6275
FACSIMILE
(907) 278-4848

Final Decision and Order    No. 06-14                                    -24-
[/LEBO 070606 Decision.doc]

Exhibit 1
Page 24 of 31

I conclude that DLC has not met its burden[10] of proving that ASD had a basis of knowledge within the year prior to Parent's filing of her January 25, 2006 request for hearing.[11] The information available to ASD in the spring of 2005 was that Student had been previously eligible for special education, that he was performing fairly well at school, that he was receiving counseling for matters having to do with problems and behaviors outside of school, and that he was suspended twice for relatively short periods of time at the end of the school year. To the extent that the IDEA 1997 standard applies to that information, it did not rise to the level of "behavior or performance of the child [that] demonstrates the need for [SPED] services."

In the fall, Student's academic performance continued to decline – he received Bs and Cs, with a D in Language Arts and an F in Math -- and his behavioral problems deteriorated as well. I find, however, that these problems do not meet the basis of knowledge requirements of IDEA 2004. There is no dispute that Parent did not "express concern in writing . . . that the child [was] in need of special education and related services," nor did she request an evaluation of Student, prior to January 25, 2006.

---

[10] I would be reaching the same result even if the Alaska Board of Education had not amended 4 AAC 52.550(e)(9) and ASD still had the burden of proof on this issue.

[11] As with the discussion of the limitations period for 504 claims discussed above, I do not find that the discovery rule should result in an extension of the one-year limitations period based on Parent's apparent lack of knowledge of Student's IDEA rights; ASD provided adequate information to Parent via the Notice of Procedural Safeguards, and beyond that ASD should not be charged with the burden of informing Parent of every possible nuance of special education rights and remedies, when neither party had a grasp of the current manifestations of Student's disabilities.

LAW OFFICES OF
ANDREW M. LEBO
425 G Street, Suite 920
ANCHORAGE, AK 99501
(907) 278-6275
FACSIMILE
(907) 278-4648

Final Decision and Order    No. 06-14                                    -25-
[/LEBO 070606 Decision.doc]

Exhibit 1
Page 25 of 31

As for the third element of 20 U.S.C. sec. 1415(k)(5)(B), DLC argues that Mr. Jefts was within the definition of "supervisory personnel" of ASD, and thus this element is met by his knowledge of Student's suspensions and the impact that they were having on Student's education, and the notice that he received from Ms. Masneri (in her November 4 email) commenting on Student's "pattern" of problematic conduct.  This argument fails on several levels.  First, Mr. Jefts' obtaining knowledge of Student's suspensions through his role as the Romig disciplinarian is not equivalent to an expression of "specific concerns about a pattern of behavior demonstrated by the child," as required by the statute.  Second, the "supervisory personnel" concept in the statute is fleshed out by the regulation at 34 CFR 300.527(b), where it describes expression of "concern about the behavior or performance of the child to the director of special education of the agency or to other personnel in accordance with the agency's established child find or special education referral system."  Mr. Jefts as an assistant principal simply does not fit into this concept.  Third, and most importantly, I believe that the third element of 20 U.S.C. sec. 1415(k)(5)(B) is intended to cover expressions of concern about behavior that has some apparent relationship with a child's disability.  An expression of concern to an assistant principal, such as Ms. Masneri's email, about conduct that relates to criminal, out-of-school conduct that does not bear such an apparent relationship to the child's disability cannot give

LAW OFFICES OF
ANDREW M. LEBO
425 G Street, Suite 920
ANCHORAGE, AK 99501
(907) 276-6275
FACSIMILE
(907) 276-4848

Final Decision and Order    No. 06-14                                -26-
[/LEBO 070606 Decision.doc]

Exhibit 1
Page 26 of 31

rise to a basis of knowledge under this scheme.

## 12. Outreach Services

DLC argues that the offer of Outreach Services was improper because ASD failed to show that Outreach was a placement that was "appropriate to meet [Student's] individual educational needs." DLC's Post-Hearing Reply Brief at 12. This argument ignores the fact, however, that until mid-March Student had not even been found eligible for special education services, so at the time the offer was made ASD did not have to tailor Student's placement in such a fashion. In addition, by the time Student was found SPED eligible in mid-March, Parent had already rejected the placement at Outreach approximately a month before. And notwithstanding my statement in my March 2 order denying Student's Motion for Interim Services, in which I encouraged Parent and Student to take advantage of Outreach services pending the outcome of the hearing, Parent continued to implicitly reject the Outreach placement by keeping Student at home. I find that under these circumstances, ASD had no obligation to demonstrate that Outreach was appropriately tailored to the services that were ultimately set forth in Student's IEP in early April.

## 13. The Timing of the Evaluation

DLC contends that ASD failed to follow the requirements of 4 AAC 52.115 which mandated that ASD complete its evaluation of Student, develop an IEP and

LAW OFFICES OF
ANDREW M. LEBO
425 G Street, Suite 920
ANCHORAGE, AK 99501
(907) 276-8275
FACSIMILE
(907) 278-4848

Final Decision and Order      No. 06-14                                    -27-
[/LEBO 070606 Decision.doc]

Exhibit 1
Page 27 of 31

provide services within 45 school days of parental consent. DLC argues that the 45 school-day period should have started with Parent's January 25 request for evaluation. ASD responds that DLC has miscalculated the 45 school days, both because of a simple miscount, and because the operative starting point should have been when Parent signed the consent for evaluation on February 15.

I find that the appropriate starting date was January 25, when Parent requested the evaluation, and that the appropriate calculation of the 45 school-day period is that set forth on page 8 of ASD's Post-Hearing reply brief, which results in the 45 days ending on April 12, 2006.

### 13.  The Merits of the Evaluation

DLC argues that the March 15 evaluation of Student was flawed because it did not properly take into account Student's TBI. More specifically, DLC argues that the school psychologist improperly opined that Student did not meet the eligibility criteria for special education eligibility under TBI due to Student having initially suffered TBI during his premature birth, that Alaska regulations improperly exclude anyone whose TBI relates to premature birth from being TBI eligible, and that this resulted in Student's eligibility being found under the OHI category.

Parent and her DLC advocate, however, were both in agreement with the finding of OHI eligibility, and they both signed the document setting forth that

LAW OFFICES OF
ANDREW M. LEBO
425 G Street, Suite 920
ANCHORAGE, AK 99501
(907) 276-8275
FACSIMILE
(907) 278-4548

Final Decision and Order    No. 06-14                                    -28-
[/LEBO 070606 Decision.doc]

Exhibit 1
Page 28 of 31

finding on March 7, 2006. Evaluation Summary and Eligibility Report, Exhibit 60, at 3. Because they agreed with the finding in March, a mere six weeks before the start of this hearing, I will not disturb the eligibility determination of OHI.[12]

### 14. Compensatory Education

I have ruled in ASD's favor on all of the issues before me in this matter, with the exception of Parent's claim that ASD did not comply with the requirement of 4 AAC 52.115 which mandated that ASD complete its evaluation of Student, develop an IEP and provide services within 45 school days. By my calculations, the 45th school day would have fallen on April 12, 2006. Student did not return to school and start attending Mears until April 24, 2006, seven school days after April 12. As noted above, there was testimony that he was authorized to start at Mears on April 17, and the record is unclear as why he did not start until a week after that date. In addition, it is relevant here that Student's April 3 IEP contemplated that he start back to school on April 11.

When fashioning an equitable compensatory education remedy, there is no obligation under the I.D.E.A. to provide for day-for-day or hour-for-hour compensation for services not provided to the student. Parents of Student W. v. Puyallup Sch. Dist. No. 3, 31 F.3d 1489, 1497 (9th Cir. 1994). The question of

---

[12] DLC appears to argue that the flawed OHI eligibility determination inexorably led to the flawed manifestation determination, because it caused the MD team to examine the wrong criteria in making its determination. I have already ruled, however, that the "no causality" finding had no negative impact on Student's education, and further that I would not substitute my judgment for that of the MD team.

LAW OFFICES OF
ANDREW M. LEBO
425 G Street, Suite 920
ANCHORAGE, AK 99501
(907) 276-8275
FACSIMILE
(907) 278-4848

Final Decision and Order    No. 06-14                                    -29-
[/LEBO 070606 Decision.doc]

Exhibit 1
Page 29 of 31

what amount of compensatory education should be awarded is a fact-specific inquiry; the award of compensatory education is not a simple entitlement to an equal amount of educational services, because the remedy is equitable rather than contractual in nature. Id.

I find that an award of compensatory education is appropriate to compensate Student for the delay in receiving services after he was found eligible for special education services and his IEP was developed and ready to be implemented. To determine the amount of compensatory education that is appropriate to award in this matter, I must weigh the evidence presented by both sides and weigh the actions of both ASD and Parent with regard to Student's education. See Parents of Student W, 31 F.3d at 1489, 1497 (9th Cir. 1994) ("the behavior of [the student's] parents is also relevant in fashioning equitable relief"); W.G. v. Board of Trustees of Target Range Sch. Dist., 960 F.2d 1479, 1486 (9th Cir. 1992) ("the conduct of both parties must be reviewed to determine whether relief is appropriate").

In this context, on the one hand I believe that although ASD's actions did result in delay of delivery of services, ASD also attempted throughout this matter to follow the law under difficult circumstances and to provide an education to Student via the Outreach program. On the other hand I believe that Parent did her best to act in Student's best interests, but I cannot help but note that Parent's decision to have Student not attend Outreach resulted in him staying at home,

LAW OFFICES OF
ANDREW M. LEBO
425 G Street, Suite 920
ANCHORAGE, AK 99501
(907) 276-8275
FACSIMILE
(907) 276-4846

Final Decision and Order    No. 06-14                                    -30-
[/LEBO 070606 Decision.doc]

Exhibit 1
Page 30 of 31

receiving no education of any kind, for over three months.

Having weighed all the evidence and balanced the equities between the parties, and taking note of the fact that Student's current IEP apparently calls for him to receive 5.75 hours of special education services per week, I make the following award of compensatory education services to Student: 7.00 hours of special education services, in the form of services that are deemed appropriate by Student's IEP team.

In accordance with AS 14.30.193(f) and 20 U.S.C. 1415(i)(1)(A), this decision is a final administrative order. The parties are reminded that either party may appeal this decision within 30 days with the Alaska Superior Court, pursuant to AS 14.30.193(f) and AS 44.62.560. An appeal may also be taken pursuant to 20 U.S.C. 1415(i)(2)(A) and 34 CFR 300.512, and applicable federal rules.

DATED at Anchorage, Alaska, this 6th day of July, 2006.

_____
Andrew M. Lebo, Alaska Bar #9011106
Due Process Hearing Officer

Certificate of Service

The undersigned certifies that on the 6th day of July, 2006, a true and correct copy of the foregoing Order was served by email and U.S. mail on Brad Owens and Meg Allison.

7/7/06

_____
Andrew M. Lebo

LAW OFFICES OF
ANDREW M. LEBO
425 G Street, Suite 920
ANCHORAGE, AK 99501
(907) 276-8275
FACSIMILE
(907) 278-4648

Final Decision and Order    No. 06-14                                   -31-
[/LEBO 070606 Decision.doc]

Exhibit 1
Page 31 of 31